# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION

| | | |
|---|---|---|
| **JOHN F. HARMAN, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER: _____** |
| | ) | |
| **THE PRUDENTIAL LIFE** | ) | |
| **INSURANCE COMPANY OF** | ) | |
| **AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, John F. Harman, III, and hereby files his
Complaint against The Prudential Insurance Company of America.

## PARTIES

1.      The Plaintiff, John F. Harman, III ("Mr. Harman"), is an insured
under ERISA-governed Long-Term Disability Policy No. G-42111-NV (the
"Plan") who has been improperly denied disability benefits under the Plan.

2.      Defendant, The Prudential Insurance Company of America
("Prudential") is the Administrator for the Plan issued to Caesar's Entertainment
Operation Co., Inc. Defendant has improperly denied owed benefits to Mr. Harman
under the group Long Term Disability Policy No. G-42111-NV.  Upon information
and belief, Prudential is a foreign corporation doing business in the State of North

Carolina.

## JURISDICTION AND VENUE

3.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.  Plaintiff asserts claims for long-term disability benefits, enforcement of ERISA rights, and statutory violations of ERISA under 29 U.S.C. §1132.  This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties.  29 U.S.C. §1132(a),(e)(1) and (f) and 28 U.S.C. §1131.  Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b).

## INTRODUCTION

4.     The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans."  *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983).  Mr. Harman, as an employee insured for disability, was supposed to be treated as a beneficiary by the Defendant as statutory fiduciary.  Instead, the Defendant victimized Mr. Harman by engaging in utterly reprehensible claim handling procedures. The shortcomings of ERISA as it relates to claims for "welfare" benefits have been exploited by the Defendant to avoid paying Mr. Harman's valid claim that would otherwise be payable under state insurance law. As described in more detail below, the Defendant has clearly engaged in bad faith claim handling and Mr. Harman, at a minimum, is patently

2

entitled all relief that ERISA provides.

## STATEMENT OF FACTS

5.      Mr. Harman is an insured under Prudential's Group Policy No. G-42111-NV sponsored by his employer Caesars Entertainment Group Co., Inc. The insurance provides insureds, like Mr. Harman, long term disability benefits.

6.      Mr. Harman was born on May 25, 1956. He worked at Caesars Entertainment Group Co., Inc. as a Table Game Dealer until his disabilities, primarily from hepatitis C and side effects from a liver transplant, prevented him from returning to work.

7.      Mr. Harman's medical impairments include a multitude of symptoms arising from hepatitis C and liver transplant surgery, including severe chronic fatigue, hypertension, lower extremity edema, cellulitis, chronic pain, memory loss, depression, confusion, neuropathy, skin cancers, and other illnesses. All of these conditions and symptoms render Mr. Harman unable to work.

8.      Mr. Harman first learned of his liver disease in 2004 by Dr. Christin Legeate, his primary physician. (*See* June 22, 2007 Consultation, attached hereto as Exhibit "A"). Because he was asymptomatic and had normal liver function at the time, Mr. Harman elected to defer from any type of treatment. (*See* Exhibit "A").

9. Three years later in 2007, Mr. Harman began experiencing symptoms such as "ascites, memory loss, fatigue, weakness, muscle wasting, joint pain,

itching and rashes." (*See* Exhibit "A").

10.     Dr. Legeate discovered rising ALT numbers in Mr. Harman's bloodwork and referred him to a gastroenterologist, Dr. Mohammed Shafi. (*See* Exhibit "A"). Dr. Shafi then performed an endoscopy and colonoscopy. (*See* Quest Diagnostics, attached hereto as Exhibit "B").

11.     After obtaining results from both procedures, Dr. Shafi devastatingly discovered that Mr. Harman had cirrhosis of the liver and stage IV liver failure. (*See* Exhibit "B").

12.     In a consultation report dated June 22, 2007, Joanne Garcia, APN-C met with Mr. Harman and advised him of his condition. During this consultation it was also noted that Mr. Harman appeared to be "chronically ill." (*See* Exhibit "A").

13.     After his diagnosis, Mr. Harman could no longer perform his duties as required by Caesars Entertainment as a Table Game Dealer, which required standing for long periods of time, lifting chairs, and remaining attentive while watching players (*See* Paris/Bally's Las Vegas Job Description, attached hereto as Exhibit "C").

14.     His chronic pain and fatigue disabled him from the ability to stand for long periods of time, and his memory loss disabled him from using proper judgment and concentration amongst distractions.

15.     Mr. Harman left work on July 8, 2007 to undergo extensive treatments for liver failure. (*See* Email to Darleen Bucaro, attached hereto as Exhibit "D").

16.     After several immunotherapy treatments, Mr. Harman met with Ms. Garcia, APN-C again during a follow-up appointment on September 19, 2007. (*See* September 19, 2007 Clinic Notes, attached hereto as Exhibit "E").

17.     Despite ongoing treatments, Mr. Harman was still suffering from chronic fatigue, insomnia, memory loss, confusion, and experienced difficulty staying awake throughout the day. Ms. Garcia, APN-C also noted that he exhibited "intermittent myalgias [muscle pain]," "depression," "swelling," and "shortness of breath." (*See* Exhibit "E").

18.     This follow-up appointment lead to a discussion of the imminent need for liver transplant surgery. Ms. Garcia, APN-C wrote to Dr. Shafi that they would register him for a liver transplant. (*See* Exhibit "E").

19.     While waiting for an organ donor, Mr. Harman continued to suffer through anxiety, confusion, and difficulty concentrating, as explained in his clinic notes from another follow-up treatment on November 12, 2007. (*See* November 12, 2007 Clinic Notes, attached hereto as Exhibit "F").

20.     Because of his increased depression, confusion, and inability to make decisions for himself, Mr. Harman consulted his sister, Ms. Susan Harman-Scott, Esq., who he temporarily appointed as power of attorney in handling his affairs.

(*See* General Power of Attorney, attached hereto as Exhibit "G").

21.     On May 24, 2008, Mr. Harman was approved for Social Security Disability benefits on initial application. (*See* May 24, 2008 Notice of Award, attached hereto as Exhibit "H").

22.     Mr. Harman continued exhaustive treatments for liver failure while desperately awaiting a liver donation. During that time, Mr. Harman moved to North Carolina, where he was taken care of by his sister.

23. On September 17, 2008, Mr. Harman underwent liver transplant surgery, performed by Dr. David Gerber at the University of North Carolina Hospital in Chapel Hill.

24.     Prudential approved Mr. Harman for long-term disability benefits on December 23, 2008 due to his inability to perform his regular occupation as a Table Game Dealer. (*See* December 23, 2008 Letter from Prudential, attached hereto as Exhibit "I").

25.     After Mr. Harman's liver transplant, Prudential required Mr. Harman to complete multiple forms regarding his activities and daily living. (*See* Letters from Prudential, attached hereto as Exhibit "J").

26.     Mr. Harman consistently stated that he remained extremely fatigued, dizzy, and unable to maintain focus. (*See* Activities of Daily Living Questionnaire, attached hereto as Exhibit "K").

27. Prudential also required Mr. Harman's primary physician, Dr. Terry Arnold, to complete capacity questionnaire forms regarding whether Mr. Harman could return to part-time or full-time work. Dr. Arnold stated that Mr. Harman would *never* be able to return to full-time work, nor was he currently able to return to work in any capacity. (*See* Capacity Questionnaire, attached hereto as Exhibit "L").

28. Dr. Arnold also completed an Attending Physician Statement and stated that Mr. Harman's inability to return to work was due to excessive fatigue and weakness. (*See* Attending Physician Statement, attached hereto as Exhibit "M").

29. On November 11, 2016, Prudential informed Mr. Harman that on October 31 he would no longer meet the definition of disability and therefore his claim was closed. (*See* November 11, 2016 Letter from Prudential, attached hereto as Exhibit "N").

30. Prudential justified this denial of benefits mainly based off the absurd assumption that his severe fatigue, depression, and joint pain are not indicative of "functional impairment." (*See* Exhibit "N").

31. Prudential also based their denial on Mr. Harman's ability to obtain a part-time online college degree and his very sporadic part-time work as a Director of Contemporary Worship for his church. (*See* Exhibit "N").

32. Not only did Prudential completely ignore Dr. Arnold's assertion that

Mr. Harman could not work in any capacity, but also ignored Mr. Harman's other conditions such as his chronic joint pain, neuropathy, and the multitude of other symptoms from a severely suppressed immune system. Prudential acknowledged the fact that Dr. Arnold stated that Mr. Harman could not work in any capacity, but then simply decided to not give any weight to the determination of Mr. Harman's treating physician. (*See* Exhibit "N").

33.     Mr. Harman appealed Prudential's termination of benefits by letter dated May 10, 2017.  (*See* May 10, 2017 Letter to Prudential, attached hereto as Exhibit "O").

34.     Despite being provided with extensive medical records showing Mr. Harman's continuing chronic pain, fatigue, neuropathy, swelling, and other debilitating side effects from his necessary medications, Prudential denied Mr. Harman's appeal on August 24, 2017. (*See* August 24, 2017 Denial Letter, attached hereto as Exhibit "P").

35.     Prudential exclusively relied on the determination made by a paid medical reviewer, who never examined Mr. Harman. (*See* Advisory Report, attached hereto as Exhibit "Q").

36.     The paid reviewing consultant determined that despite all of Mr. Harman's struggles, he had no medically necessary restrictions or limitations beyond 2015 when he stopped his Harvoni medication. (*See* Exhibit "Q").

8

37.     With full knowledge that Mr. Harman suffered from an extremely debilitating form of hepatitis C and would almost certainly have continued symptoms from his liver transplant surgery, Prudential absurdly suggested that Mr. Harman could return to full-time employment. (*See* Exhibit "Q").

38.     Mr. Harman continues to suffer a multitude of post-transplant problems and side effects from hepatitis C. (*See* Declaration of Harman, attached hereto as Exhibit "R").

39.     Mr. Harman's post-transplant immunosuppressant medications leave him much more susceptible to illnesses, making it very difficult for him to be in public places. (*See* Exhibit "R"). For example, in 2015, Mr. Harman was treated three different times for congestion, sore throat and other flu-like symptoms all within only three months' time. (*See* Exhibit "S" September 14, 2015 Clinic Notes; Exhibit "T" November 12, 2015 Clinic Notes; Exhibit "U" December 21, 2015 Clinic Notes).

40.     Mr. Harman also suffers from neuropathy in his right hand, which prohibits him from performing simple daily tasks such as dressing himself, turning on lamps, and using utensils. (*See* Exhibit "R").

41.     Mr. Harman suffers from chronic joint pain due to inflammation, which has not improved since beginning treatment. (*See* Exhibit "R").

42.     Mr. Harman continues to suffer from extreme fatigue, insomnia, and

depression following Harvoni treatments for hepatitis C. For over two years and in each follow-up appointment both before *and* after Harvoni treatment, Mr. Harman consistently raised complaints of severe fatigue, and on May 15, 2017, complained that he in fact felt worse and more fatigued since completing treatment. (*See* May 15, 2017 Clinic notes, attached hereto as Exhibit "V").

43.     In addition, on January 15, 2018, Dr. Arnold noted that Mr. Harman was "sallow-appearing" and "chronically ill-appearing." (*See* Annual Wellness Visit, attached hereto as Exhibit "W").

44. In light of the fact that Mr. Harman still suffers from severe, chronic fatigue, joint pain, inflammation, and a multitude of other symptoms from an impaired immune system prior to Prudential's final denial, Mr. Harman submitted a second appeal on February 20, 2018. (See February 20, 2018 Letter to Prudential (without attachments), attached hereto as Exhibit "X").

45. Prudential delivered its final denial on March 26, 2018. (*See* March 26, 2018 Letter from Prudential, attached hereto as Exhibit "Y"). Once again, Prudential ignored the opinions of Mr. Harman's treating physicians and wrongly asserted that Dr. Arnold's opinions and statements were not supported by evidence.

46.  As of this date Mr. Harman has been denied benefits rightfully owed to him under the plan. Prudential's decision to deny LTD benefits under the plan was grossly wrong, without basis and contrary to the evidence.

47.   Mr. Harman met and continues to meet the plan's definition of "disabled."

48.   The Defendant did not establish and maintain a reasonable claim procedure or provide a full and fair review of Mr. Harman's claim as required by ERISA.  Instead, Defendant acted only in its own pecuniary interests and violated ERISA by conduct including, but not limited to, the following: reviewing the claim in a manner calculated to reach the desired result of denying benefits; failing to properly consider and credit the medical opinions of Mr. Harman's medical providers; failing to properly consider and credit the SSA's determination, and failing to have Mr. Harman submit to independent medical exams as allowed by the Plan.

49.   Upon information and belief, the Plan does not grant discretionary authority to determine eligibility for benefits to Prudential or to any other entity who may have adjudicated Mr. Harman's claim. Therefore, the Court should review the Plaintiff's claim for benefits under a *de novo* standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In the alternative, the denial of Plaintiff's benefits constitutes an abuse of discretion.

50.   Upon information and belief, Prudential was required to both evaluate and pay claims under the LTD Plan at issue, creating an inherent conflict of interest.

51.    Mr. Harman has exhausted any applicable administrative review procedures, and Prudential's refusal to pay benefits is both erroneous and unreasonable and has caused tremendous financial hardship on Plaintiff.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

**A.    Defendant's Determination that Plaintiff does not Meet the Definition of Disability as Stated in the Plan was both Erroneous and Unreasonable.**

52.    The Long Term Disability plan at issue states, in part:

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:

- You are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience; and
- You are under the regular care of a doctor.

(*See* Prudential LTD Policy, attached hereto as Exhibit "Z").

53.    Prudential failed to properly evaluate the effect Mr. Harman's conditions as a whole would have on his ability to work. As shown by its denial letters, Prudential has consistently cherry-picked notes of miniscule improvement from Mr. Harman's extensive medical records in order to wrongfully deny his claim on the grounds that he can work fulltime.

54.    Prudential highlight the fact that Mr. Harman's lab results improved after completion of Harvoni treatment, but they completely ignore his primary physician's opinion that he remain disabled from all work, or the fact that he is

continuously prescribed immunosuppressants and continues to suffer from constant chronic pain and fatigue.

55.    Mr. Harman was never cured or informed that he would not require treatment again.

56.    Prudential opportunistically denied Mr. Harman the benefits due to him when his side effects were lessened for a brief period of time.

57.    Worst of all, when shown clear evidence that Mr. Harman was more fatigued after Harvoni treatments prior to rendering their final denial, Prudential refused to properly consider the impact of his fatigue on his ability to work.

58.    Mr. Harman's necessary treatments have left him with chronic joint pain, depression, muscle weakness, extreme chronic fatigue, and a multitude of illnesses that accompany immunosuppressant medications.

59.    Mr. Harman struggles with these debilitating symptoms every single day. Prudential's assertion that he is not disabled is at the very least unreasonable.

**B.    Defendant's Decision to Terminate Long Term Disability Benefits was not Supported by Substantial Evidence**

60.    In its consideration of Mr. Harman's claim, Prudential only retained paid consultants to review his medical records. The sole reason for Prudential's denial was that their paid paper reviewer, who never actually examined Mr. Harman, determined that he suffered from *no* restrictions and limitations.

61.    Considering the nature of his disease, and his well-documented

struggles with treatment, the notion that he is not restricted from work is absurd. Based on the language of the policy and common-sense practice, Prudential could have requested an independent medical examination of Mr. Harman. Instead, they determined that an in-house vocational analysis and paid paper review were superior to years of treatment records and recommendations from Mr. Harman's actual treating physicians.

62. Mr. Harman's medical files clearly demonstrate that he is disabled. Mr. Harman's treating physicians have attested to his disabilities on multiple occasions. Prudential was provided with Dr. Arnold's numerous capacity reports that consistently stated Mr. Harman would be disabled indefinitely. Prudential also had access to the Social Security Administration's determination of disability, as well as records from Dr. Arnold clearly documenting Mr. Harman's constant struggle with chronic joint pain and fatigue.

63. The records of Mr. Harman's long-standing medical providers, who have no stake in the outcome of the case, clearly evidence that he is disabled based on their numerous personal examinations, testing, and procedures. Prudential's hired medical reviewers, on the other hand, did not examine Mr. Harman. The conclusion that Mr. Harman was not disabled was based merely on hired reviewers' assessment of his paper medical records. *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801,809 (6th Cir. 2002)(finding that evidence in

the administrative record did not support the revocation of benefits because the only doctors that disagreed with the treating physicians were non-examining consultants hired by the insurance company); *see also Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005)("[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician").

64.    In weighing the opinions of Mr. Harman's providers against those of the independent reviewers retained by Prudential, the Court should consider the following factors: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. *See Karanda v. Connecticut Gen. Life Ins. Co., et al.,* 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F. Supp. 2d 205, 213 (D. Conn. 1998)).  The Court in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient as an individual."  While *Nord* provides that this Court is not required to adopt a per se rule to treat Mrs. Miller's physicians' opinions with more weight than those of Defendant's medical assessors, "[c]ommon sense and a

stream of legal precedent suggest, however, factual determinations of a treating physician are objectively more reliable." *Burt v. Metropolitan Life Insurance Co.,* No. 1:04-CV-2376-BBM, 2005 U.S. Dist. LEXIS 22810, at *33 (N.D. Ga. Sept. 16, 2005); *see also Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 795-96 (W.D. Mich. 2004) ("the Court is not obliged to 'rubber stamp' [defendant's] termination of benefits . . .").

    65. Paid experts are more often than not pre-disposed or preconditioned. Courts have consistently expressed their skepticism of such "experts" and held their reviews to be the very essence of arbitrariness and capriciousness. *Bennett v. Kemper HAT-Svcs, Inc.* 514 F. 3d 547, 554-55 (6th Cir. 2008); *Montour v. Hartford Life and Acc. Ins. Co.,* 588 F. 3d 623 (9th Cir. 2009); *Regula v. Delta Family Care Plan* 226 F.3d. 1130, 1143 (9th Cir. 2001). The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and preserve their own consulting agreements.'" *Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). The fact that their reports are consistently in conflict with the opinion of treating doctors' determinations should be viewed as evidence of a structurally conflicted process that results in bias. Clearly, in Mr. Harman's case, these decisions indicate that his own medical physicians' evaluations should be afforded far greater weight than those of Defendant,

especially since Defendant's reviewers never bothered with even one of the multiple physical exams allowed by the Plan. (*See* Exhibit "Z"). Accordingly, Defendant's denial of Mr. Harman's LTD benefits, based on insufficient evidence, was arbitrary and capricious.

## C. Defendant's Failure to Properly Credit Mr. Harman's Well Documented Complaints of Chronic Fatigue and Chronic Joint Pain was Arbitrary and Capricious

66. Some of Mr. Harman's primary disabling impairments have subjective components; however, they have been diagnosed by his treating physicians based on his medical history, physical examinations, and observation. In its denial letters, Prudential made no mention of how Mr. Harman's chronic pain and fatigue from his necessary medical treatments would affect his ability to perform work, nor is there any evidence in the records that Prudential even considered Mr. Harman's susceptibility to illnesses from immunosuppressant medications in deciding whether or not to terminate his benefits.

67. In *Quigley v. UNUM Life Ins. Co. of America,* 340 F. Supp. 2d 215, 224 (D.Conn. 2004), the Court held "[w]here the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints. *Id.* at 224.

17

68. In *Creel v. Wachovia Corp.*, No. 08-10961, 2009 U.S. App. LEXIS 1733, 2009 WL 179584 (11th Cir. Jan. 27, 2009) and *Oliver v. Coca-Cola Co.*, 497 F.3d 1181, 1196-97 (11th Cir. 2007), vacated in part on other grounds, 506 F.3d 1316 (11th Cir. 2007), the United States Court of Appeals for the Eleventh Circuit considered when it was substantively reasonable to deny benefits for disabilities involving subjective elements. In *Creel*, the plaintiff applied for disability benefits based on a diagnosis of depression, anxiety, and migraine headaches. She received long-term disability benefits, but the benefits were terminated after twenty-four months pursuant to a mental disorder limitation. She sued the insurance company to recover additional benefits based on her migraine headaches. She provided chart notes, standard diagnoses, and lab reports from multiple physicians to support her claim, but the district court entered summary judgment against her because she did not provide objective evidence. The Court of Appeals vacated the summary judgment order, explaining:

> Our prior cases provide guidance for assessing the reasonableness of benefits denials for disabilities that involve some subjective element, such as migraines, fibromyalgia, and chronic pain syndrome. . . . When the plan has no [objective evidence requirement,] we evaluate the reasonableness of the decision in light of the sufficiency of the claimant's subjective evidence and the administrator's actions. Assuming that the claimant has put forward ample subjective evidence, we look at what efforts the administrator made to evaluate the veracity of her claim, particularly focusing on whether the administrator identified any objective evidence that would have proved the claim and on what kinds of independent physician evaluations it conducted. Accordingly, an administrator's decision to

deny benefits would be unreasonable if it failed to identify what objective evidence the claimant could have or should have produced, even if the administrator submitted the file for peer review.

2009 U.S. App. LEXIS 1733, [WL] at *7

69.     Applying this standard, the Court of Appeals in *Creel* found that the records offered by the plaintiff to corroborate her subjective complaints of disabling headaches were sufficient to support her claim and held that the administrator's decision was both wrong and unreasonable. 2009 U.S. App. LEXIS 1733, [WL] at *8. Similarly, in *Oliver*, the plaintiff sued his employer to recover long term disability benefits based upon radiculopathy and associated cervical pain, fibromyalgia, and chronic pain syndrome. The Court of Appeals held that it was arbitrary and capricious for an employer to deny benefits for disabilities involving elements of subjective pain when the claimant provided ample evidence and the administrator never requested any additional kind of evidence. *Oliver,* 497 F.3d at 1196-97.

70.     Here, Mr. Harman provided evidence to support the claims of his numerous medical impairments. Mr. Harman's medical records contain well-documented complaints of chronic pain and treatments prescribed by his treating physicians. The records provided to Prudential show Mr. Harman's long time struggles with chronic fatigue, joint pain, as well as a host of other side effects from his necessary medications. Prudential did not credit these well-documented

19

complaints of chronic fatigue or the opinions of Mr. Harman's treating physicians, and instead unreasonably terminated his claim.

### D. Prudential Failed to Properly Consider Mr. Harman's Non-Exertional Limitations.

71.    In *Demiorovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 213-14 (2d Cir. 2006), the Court stated "[A] reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances." Thus, an administrator must consider whether a beneficiary has "the vocational capacity to perform any type of work. . . that actually exists in the national economy." *Id*. at 213-215.

72.    The Court must also consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity. *See Rabuck v. Hartford Life and Accident Ins. Co.,* 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").

20

73.  It has been documented multiple times in Mr. Harman's medical records that he suffers from the side effects of his necessary medications and treatment. Mr. Harman's immunotherapy treatments have caused increased suppression in his immune system, and Dr. Arnold noted that it had caused "ongoing symptoms of fatigue." (*See* Exhibit "W").

74.  Mr. Harman's inability to sit for an extended period of time has been shown to be limited at best by Dr. Arnold's capacity reports. Perhaps most importantly, Mr. Harman has been fighting an extremely debilitating disease for years and continues to suffer its exhausting and damaging side effects.

### E.  Prudential Failed to Justify Taking a Position Different from the Social Security Administration on the Question of Disability

75.  Prudential failed to discuss any substantive reasons for reaching a decision contrary to that of the SSA.

76.  In stark contrast to Prudential's findings that Mr. Harman had no medical impairment that would limit his ability to perform any occupation, the Social Security Administration found Mr. Harman to be disabled, and granted him SSD benefits on initial application.

77.  Though Mr. Harman's claim for disability was strong enough to overcome the daunting odds for a Social Security claimant and be approved on

initial application, it simply has not fully addressed the favorable decision and Social Security evidence.[1]

78.    Courts have repeatedly acknowledged that the Social Security Administration's disability decision should be a "significant factor" in a Court's consideration of an administrator's decision to terminate plaintiff's disability benefits. *Glenn,* 461 F.3d at 669. *See also Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 294 (6th Cir. 2005) ("the SSA determination, though certainly not binding, is far from meaningless"). Even though a favorable decision in a Social Security disability appeal does not make a claimant automatically entitled to disability benefits under an ERISA plan:  [i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the administrator's decision was arbitrary or capricious.  *Bennett v. Kemper Nat. Services, Inc.,* 514 F.3d 547, 554 (6th Cir. 2008). *See also DeLisle v. Sun Life Assur. Co. of Canada,* 558 F.3d 440, 446 (6th Cir. 2009).

79.    Here, the plan required that Mr. Harman apply for Social Security disability benefits. Prudential even retained a company, Reliable Review Services,

---

[1] Historically only 35% of Social Security disability claims are initially approved. (*See* Social Security Admin., 2011 Disabled Worker Beneficiary Statistics, at www.ssa.gov)

to help ensure that Mr. Harman's claim was approved.

80.     However, when Prudential decided to terminate Mr. Harman's claim, it no longer was interested in the SSA's determination and in its denial letters, Prudential merely stated that it had considered the SSA determination but was not bound by it. (*See* Exhibit "Y").

81.     As noted in *Bennett,* the "mere mention of the [Social Security] decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA." *Bennett,* 514 F.3d at 553, n.2.

82.     The Sixth Circuit has held that it is "totally inconsistent" to require a claimant to apply for Social Security disability benefits, avail itself of the SSA's determination and, at the same time, contend that the claimant is not disabled. *Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516, (6th Cir. 2003) (partially overruled on other grounds by *Black and Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003)).

83.     Although an ERISA plan administrator is not bound by an SSA determination finding of total disability, it is inappropriate for a plan administrator to discount an SSA award in making benefit determinations, especially when the claimant was required to apply for SSA benefits. *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 553(6th Cir. 2008). Indeed, "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or

discount it later, casts additional doubt on the adequacy of their evaluation of . . .

[a] claim[.]" *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294-95(6th Cir. 2005).

84.    The Eleventh Circuit examined the juxtaposition between a Defendant insurer's self-interested SSD benefit policy requirements and its failure to give a SSA decision appropriate weight in its own disability denial determination under that same policy. *Melech v. Life Insurance Co. of N.A.*, 739 F.3d 663 (11th Cir. 2014).   On appeal, the *Melech* Court described Defendant LINA's policy in that case as follows:

> To summarize, the Policy effectively requires all claimants to apply for SSDI [Social Security Disability Income] at the outset; if a claimant fails to do so, LINA can reduce her benefits under the Policy, if any, by the amount of SSDI LINA says she could have gotten. In the event that LINA decides to pay a claim, the Policy allows LINA to hold the claim open, at least with respect to the total amount LINA must pay, until the SSA reaches a final decision. LINA may assist the claimant in obtaining SSDI, even going so far as to transfer the medical evidence that LINA gathered to LINA's vendor, who then presumably transfers it to the SSA. And if the SSA denies the claimant's application, LINA can force the claimant to exhaust her administrative appeals. All this effort makes perfect sense from LINA's perspective because--having decided to pay the claim--every dollar the claimant gets from the SSA is one less dollar LINA has to pay.

*Melech*, 739 F.3d at 668. Given these policy provisions and the fact that LINA, at the time of its denial, did not have the evidence plaintiff presented to the SSA, the Court held "*that LINA had an obligation to consider the evidence presented to the SSA.*"  *Id.* at 666 (emphasis added).  The Court went on to state that "in light of

24

these openly self-interested efforts, ***we are troubled by the implication of LINA's actions in Melech's case, where it ignored her SSDI application and the evidence generated by the SSA's investigation once it no longer had a financial stake in the outcome.***" *Id.* at 674 (emphasis added).

85.     In Mr. Harman's case, the Plan required him to apply for Social Security disability benefits and exhaust the highest level of SSA appellate review in the event such SSD benefits were initially denied.

86.     Mr. Harman applied for Social Security Disability benefits, as required by the policy.

87.     Prudential was given a copy of Mr. Harman's entire Social Security claim file, but in its denial letter Prudential failed to adequately explain why it reached a conclusion contrary to that of the Social Security Administration's finding of disability.

## CAUSES OF ACTION

### Count One
### ERISA (Claim for Benefits Owed under Plan)

88.  Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

89.  At all times relevant to this action, Mr. Harman was a participant of the Long-Term Disability Policy No. G-42111-NV ("the Plan") within the meaning of 29 U.S.C § 1002(7), and was eligible to receive disability benefits under the Plan.

90.  As more fully described above, the termination and refusal to pay Mr. Harman benefits under the Plan for Long-Term Disability for the period of at least on or about November 1, 2016 through the present constitutes a breach of Defendant's obligations under the plan and ERISA. The decision to terminate benefits to Mr. Harman was not reasonable and it was not based on substantial evidence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court to enter judgment for Plaintiff and otherwise enter an Order providing that:

1.      The applicable standard of review in this case is *de novo*.

2.      That the Court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate *de novo* review;

3.      From at least June 22, 2007 through the present, Mr. Harman met the Plan's definition of disabled;

4.      Defendant shall pay Mr. Harman all benefits due for the period from at least November 1, 2016 through the present in accordance with the policy;

5.      Defendant shall pay to Plaintiff such prejudgment interest as allowed by law;

6.      Defendant shall pay Plaintiff's costs of litigation and any and all other reasonable costs and damages permitted by law;

7.    Defendant shall pay attorney's fees for Plaintiff's counsel;

8.    Plaintiff shall receive such further relief against Defendant as the Court deems lawful, just and proper;

9.    In the alternative, Plaintiff prays the Court to enter an Order remanding this case to Defendant, as administrator, to reconsider Plaintiff's appeal, taking into full consideration the evidence presented to the Social Security Administration and the Social Security Administration's decision.

Respectfully Submitted,


_/s/ Brian L. Kinsley_____
Brian L. Kinsley, Esq.
blkinsley@crumleyroberts.com
CRUMLEY ROBERTS, LLP
2400 Freeman Mill Road, Ste. 200
Greensboro, NC 27406
Phone: 336-333-9899
Fax: 336-333-9894
NC State Bar No. 38683

Amanda Stansberry-Johns, Esq.
*Appearance anticipated*
ajohns@burkeharvey.com
BURKE HARVEY, LLC
3535 Grandview Parkway
Suite 100
Birmingham, Alabama 35243
Phone:  205-930-9091
Fax:   205-930-9054

*Attorneys for Plaintiff John F. Harman, III*

27

**<u>PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AT:</u>**

The Prudential Insurance Company of America
100 Mulberry Street
Gateway 3
7th Floor
Newark, NJ  07102-406